UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| AMY CROSBIE,<br><br>                Plaintiff,<br><br>v.<br><br>UTAH STATE UNIVERSITY, ELIZABETH R. CANTWELL, DIANA SABAU, and MICA MCKINNEY,<br><br>                Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART [17] DEFENDANTS' MOTION TO DISMISS**<br><br>Case No. 1:25-cv-00121-DBB-JCB<br><br>District Judge David Barlow |

Before the court is Defendants Utah State University ("USU"), Elizabeth Cantwell, Diana Sabau, and Mica McKinney's (collectively "Defendants") Motion to Dismiss for Lack of Jurisdiction and Failure to State a Claim.[1]

## BACKGROUND

This case arises out of the events surrounding Plaintiff Amy Crosbie's termination from her position as the Executive Associate Athletic Director and Senior Women Administrator ("Associate Director") at USU in 2024.[2] In her Amended Complaint, she alleges as follows.[3]

Ms. Crosbie was employed by USU as Associate Director from 2019 to 2024.[4] During 2024 when Ms. Crosbie was terminated, Ms. Cantwell was the President of USU, Ms. Sabau was the Vice President and Director of Athletics ("Athletic Director") at USU, and Ms. McKinney

---

[1] Mot. to Dismiss ("MTD"), ECF No. 17, filed Sep. 26, 2025.
[2] First Amended Compl. ("Amended Compl.") ¶ 3, ECF No. 13, filed Sep. 18, 2025.
[3] Because this is a motion to dismiss, the court treats the fact allegations in the complaint as true.
[4] *Id.*

was the Vice President of Legal Affairs and General Counsel for USU.[5] Ms. McKinney remains in her position at USU, but Ms. Cantwell and Ms. Sabau have both taken other jobs.[6]

**Incident Report and Investigation**

On April 12, 2023, Ms. Crosbie and the USU Director of Student Affairs, Eric Olsen, were informed by USU Interim Athletic Director Jerry Bovee that a student athlete had been arrested by local police.[7] Later that day, Mr. Olsen submitted an incident report to the USU Office of Equity ("OOE") that included all the information about the arrest that Ms. Crosbie was aware of at the time.[8] Once the incident report was submitted, Ms. Crosbie did not receive a copy and did not have access to view, amend, or supplement the report.[9]

In August 2023, USU hired Ms. Sabau as Athletic Director.[10] Ms. Sabau treated Ms. Crosbie and Mr. Bovee poorly, creating strained relationships within the department.[11] Shortly after joining USU, Ms. Sabau announced that Husch Blackwell, a private law firm, would be investigating the events surrounding the student athlete's arrest.[12] Upon a request from Ms. McKinney, Ms. Crosbie agreed to assist with the investigation by collecting documents and coordinating interviews.[13] On October 11, 2023, Ms. Crosbie met with two of the investigating attorneys.[14] During the interview, Ms. Crosbie answered all of the investigators' questions about her knowledge of the student athlete's arrest.[15] She told the investigators she remembered that,

---

[5] *Id.* ¶¶ 5–7.
[6] *Id.*
[7] *Id.* ¶ 34.
[8] *Id.* ¶¶ 34–36.
[9] *Id.* ¶ 38.
[10] *Id.* ¶ 49.
[11] *Id.* ¶¶ 50–52.
[12] *Id.* ¶ 54.
[13] *Id.* ¶¶ 57–58.
[14] *Id.* ¶ 59.
[15] *Id.* ¶ 61.

sometime after submitting the incident report, Mr. Bovee had shown her a witness statement about the arrest that she assumed had been obtained by Coach Anderson (the USU football coach), though she did not know how.[16]

During this time, Ms. Sabau continued to mistreat Ms. Crosbie and Mr. Bovee.[17] On December 8, 2023, Mr. Bovee met with HR to report Ms. Sabau's bullying.[18] Later, in June 2024, Ms. Crosbie also met with an HR employee to corroborate Mr. Bovee's report about Ms. Sabau's behavior.[19] During that meeting, the HR employee disclosed that Ms. Sabau had been confronted with HR complaints about her behavior and had committed to improving.[20] Even so, Ms. Sabau's mistreatment of Ms. Crosbie continued after the HR meeting.[21]

### Ms. Crosbie's Termination

On July 2, 2024, USU received the final Husch Blackwell report.[22] On July 8, 2024, USU terminated Ms. Crosbie's employment effective immediately after Ms. Cantwell and Ms. Sabau decided, with advice from Ms. McKinney, to terminate her employment.[23] Ms. Sabau provided a termination letter detailing the reasons for Ms. Crosbie's dismissal.[24] The letter stated in part that Ms. Crosbie had failed to comply with USU Title IX reporting requirements because she did not disclose the existence of the witness statement when she first learned of its existence, instead

---

[16] *Id.* ¶¶ 61–62.
[17] *Id.* ¶ 68.
[18] *Id.* ¶¶ 69–70.
[19] *Id.* ¶ 72.
[20] *Id.* ¶ 73.
[21] *Id.* ¶ 74.
[22] *Id.* ¶ 76.
[23] *Id.* ¶ 77.
[24] *Id.* ¶ 78.

waiting until her interview with investigators.[25] Ms. Crosbie never received any formal discipline or notice of these allegations prior to her termination.[26]

The final report found that Ms. Crosbie did not comply with reporting requirements but noted that she did not openly mislead the OOE and that she corrected any mistakes she made.[27] The report incorrectly stated that Ms. Crosbie knew Coach Anderson had taken steps to independently investigate the incident.[28] The report also implicated Mr. Bovee, who was dismissed from his position around the same time.[29]

In the context of USU's athletic department terminations, Ms. Sabau allegedly gave statements to newspapers that Ms. Crosbie and Mr. Bovee were fired "so that there is not a pervasive culture of sexual violence or domestic violence within any of our athletic departments,"[30] and that "good people make bad mistakes."[31] Because of these statements, Ms. Crosbie has been unable to find a new position, and other schools that she was in contact with have withdrawn their interest.[32]

**Ms. Crosbie's Appeal**

In accordance with USU policy and procedures, Ms. Crosbie submitted a grievance arguing that her employment was improperly terminated without progressive discipline and that her dismissal was not based on a valid reason under USU policies.[33] She presented her case

---

[25] *Id.* ¶¶ 81–84.
[26] *Id.* ¶¶ 79–80.
[27] *Id.* ¶ 89.
[28] *Id.* ¶ 85.
[29] *Id.* ¶ 98.
[30] *Id.* ¶ 101.
[31] *Id.* ¶ 103.
[32] *Id.* ¶¶ 104–08.
[33] *Id.* ¶ 110.

before a hearing committee on October 23 and 24, 2024.[34] She was represented by an attorney during the hearing, but her attorney was not permitted to present the case, object during the hearing, or directly question witnesses.[35] Instead, questions were submitted to committee members, who then questioned the witnesses.[36] Ms. Crosbie was also not permitted to make any retaliation arguments at the hearing, which excluded evidence of Ms. Sabau's bullying.[37]

The committee ultimately found that Ms. Crosbie's termination was unwarranted, that she was caught in ineffective reporting systems, and that conflicting evidence undermined the validity of her termination.[38] However, because USU's policies allow for termination based on "other reasons deemed valid by University Administration," the committee determined that it was compelled to find that Ms. Sabau was within her rights to terminate Ms. Crosbie's employment.[39] Based on the committee recommendation, USU Executive Vice President Laurens Smith issued a final decision on behalf of Ms. Cantwell denying Ms. Crosbie's grievance.[40]

## STANDARD

"Dismissal under Rule 12(b)(6) is appropriate only if the complaint, viewed in the light most favorable to plaintiff, lacks enough facts to state a claim to relief that is plausible on its face."[41] "A claim has facial plausibility when the plaintiff pleads factual content that allows the

---

[34] *Id.* ¶ 111.
[35] *Id.* ¶¶ 114–15.
[36] *Id.*
[37] *Id.* ¶¶ 112–13.
[38] *Id.* ¶¶ 117–21.
[39] *Id.* ¶¶ 123–26.
[40] *Id.* ¶¶ 128–29.
[41] *Abdi v. Wray*, 942 F.3d 1019, 1025 (10th Cir. 2019) (citing *United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 764 (10th Cir. 2019)).

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[42] "In evaluating a motion to dismiss, the court must take as true all well-pleaded facts, as distinguished from conclusory allegations, view all reasonable inferences in favor of the nonmoving party, and liberally construe the pleadings."[43] Conclusory statements and legal conclusions are "not entitled to the assumption of truth."[44]

Generally, "a motion to dismiss should be converted to a summary judgment motion if a party submits, and the district court considers, materials outside the pleadings."[45] "However, notwithstanding the usual rule that a court should consider no evidence beyond the pleadings on a Rule 12(b)(6) motion to dismiss, 'the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.'"[46] Courts may also consider "documents that the complaint incorporates by reference,"[47] "documents attached as exhibits to the complaint,"[48] and "matters of which a court may take judicial notice,"[49] including "facts which are a matter of public record."[50]

---

[42] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

[43] *McNellis v. Douglas Cnty. Sch. Dist.*, 116 F.4th 1122, 1130–31 (10th Cir. 2024) (quoting *Reznik v. inContact, Inc.*, 18 F.4th 1257, 1260 (10th Cir. 2021)) (also quoting *Ruiz v. McDonnell*, 299 F.3d 1173, 1181 (10th Cir. 2002)) (cleaned up).

[44] *Iqbal*, 556 U.S. at 1951 (emphasis omitted).

[45] *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) (quoting *Prager v. LaFaver*, 180 F.3d 1185, 1188 (10th Cir. 1999)).

[46] *Id.* (quoting *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002)).

[47] *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010) (citing *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007)).

[48] *Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001).

[49] *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

[50] *Tal v. Hogan*, 453 F.3d 1244, 1265 n.24 (10th Cir. 2006).

## DISCUSSION

## I.    § 1983 Claims (Causes of Action IV, V, VI)

Ms. Crosbie asserts causes of action for violations of her constitutional liberty interest, procedural due process, and substantive due process under 42 U.S.C. § 1983.[51] Section 1983 creates a civil cause of action against any person who, under the color of law "subjects, or causes to be subjected" any person to a deprivation of their constitutional rights.[52] Ms. Crosbie brings § 1983 claims against USU as an entity and against Ms. Cantwell, Ms. Sabau, and Ms. McKinney (the "Administration Defendants") in their official and individual capacities.

In their Motion to Dismiss, Defendants argue that USU and the Administration Defendants in their official capacities are not persons that can be sued under § 1983.[53] They also argue that the Administration Defendants in their individual capacities are entitled to qualified immunity from suit.[54] In her Opposition, Ms. Crosbie concedes that USU is not a person that can be sued under § 1983 but contests Defendants' other arguments.[55]

### A.    Defendants in Their Official Capacity

The Supreme Court has explained that "a suit against a state official in his or her official capacity . . . is a suit against the official's office" and is "no different from a suit against the State itself."[56] Therefore, "neither a State nor its officials acting in their official capacities are persons under § 1983."[57] But the Supreme Court also clarified that a state official sued in his or her

---

[51] Amended Compl. ¶¶ 166–92.
[52] 42 U.S.C. § 1983.
[53] MTD 25–26.
[54] *Id.* at 26.
[55] Opposition to Defendants' Mot. to Dismiss ("Opp'n") 11, ECF No. 18, filed Oct. 24, 2025.
[56] *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).
[57] *Id.*

official capacity for injunctive relief "would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'"[58]

Ms. Crosbie requests reinstatement or front pay in each of her § 1983 claims.[59] The Tenth Circuit has held that "[r]einstatement of employment is a form of prospective equitable relief" that can form the basis for an official capacity § 1983 claim.[60] Front pay is also sometimes appropriate "when reinstatement is not possible."[61] Ms. Crosbie therefore "alleges an ongoing constitutional violation in the form of her continued exclusion from employment with the University" and seeks prospective relief from the Administration Defendants in their official capacities through reinstatement or front pay.[62]

Defendants contend that reinstatement would not be an appropriate remedy in this situation because the parties' relationship has deteriorated and the Administration Defendants do not have the ability to reinstate Ms. Crosbie.[63] For the first argument, Defendants cite a Utah Supreme Court case explaining that "[r]einstatement would not be an appropriate remedy when hostilities exist between the parties or when the employment relationship has been irreparably damaged by the dispute over the discharge."[64] But federal courts have referred to reinstatement as the "preferred remedy" for prospective injunctive relief in wrongful discharge cases because it "involves the least amount of uncertainty."[65] Regardless, the facts alleged in the Amended

---

[58] *Id.* at 71, n.10 (quoting *Kentucky v. Graham*, 473 U.S. 159, 167, n.14 (1985)).
[59] Amended Compl. ¶¶ 173, 182, 191.
[60] *Meiners v. Univ. of Kansas*, 359 F.3d 1222, 1232–33 (10th Cir. 2004).
[61] *Starrett v. Wadley*, 876 F.2d 808, 824 (10th Cir. 1989).
[62] *Zimmerman v. Univ. of Utah*, No. 2:13-CV-01131, 2018 WL 3448331, at *2 (D. Utah July 17, 2018).
[63] Reply to Plaintiff's Opp'n ("Reply") 12–13, ECF No. 24, filed Nov. 21, 2025.
[64] *Thurston v. Box Elder Cnty.*, 892 P.2d 1034, 1041 (Utah 1995); Reply 12.
[65] *Stafford v. Elec. Data Sys. Corp.*, 749 F. Supp. 781, 785 (E.D. Mich. 1990) (quoting *Whittlesey v. Union Carbide Corp.,* 742 F.2d 724, 728 (2d Cir. 1984)).

Complaint do not compel the court to conclude that reinstatement in this case would be impossible due to hostilities, especially at the motion to dismiss stage and given that Ms. Sabau and Ms. Cantwell no longer work at USU.

This brings the court to Defendants' second argument on this point. Defendants contend that the § 1983 causes of action cannot state a claim for prospective relief because the Administration Defendants do not have authority to grant the requested relief even in their official capacities.[66] Specifically, they argue that Ms. Sabau and Ms. Cantwell cannot reinstate Ms. Crosbie because they no longer work at USU.[67] At first glance, this scenario seems to fall under Rule 25(d) of the Federal Rules of Civil Procedure, which states that an action against "a public officer who is a party in an official capacity" does not abate if the officer "ceases to hold office while the action is pending."[68] Instead, "[t]he officer's successor is automatically substituted as a party."[69]

But Rule 25(d) by its own language only applies to a public official who ceases to hold office "while the action is pending."[70] "It makes no provision for when a plaintiff sues a former official, in his [or her] formerly-official capacity."[71] This lawsuit commenced in state court on July 31, 2025.[72] In Ms. Crosbie's original complaint, she alleged that both Ms. Cantwell and Ms. Sabau had already left their positions at USU.[73] Because they were not public officers at USU

---

[66] Reply 13.

[67] *Id.*

[68] Fed. R. Civ. P. 25(d).

[69] *Id.*

[70] *Id.*

[71] *Mire v. Bd. of Supervisors of Louisiana State Univ.,* No. CV 15-6965, 2017 WL 785439, at *4 (E.D. La. Mar. 1, 2017).

[72] Notice of Removal to Federal Court ("Notice of Removal") 1, ECF No. 1, filed Aug. 21, 2025; *see also* Complaint and Jury Demand ("Original Compl."), ECF No. 1-3, filed Aug. 21, 2025.

[73] Original Compl. ¶¶ 5–6.

when the original complaint was filed, they could not be sued in their official capacities, and Rule 25(d) does not automatically add their successors as correct parties.[74] Ms. Sabau and Ms. Cantwell are therefore not before the court in their official capacities.

Unlike the other two administration defendants, Ms. McKinney continues to work at USU in her same position, so she is properly before the court in her official capacity.[75] Defendants argue that she, as USU's general counsel, does not have any hiring or firing authority sufficient to reinstate Ms. Crosbie or provide her with front pay.[76] A claim for prospective injunctive relief can only be maintained against an official if they have the authority to grant the relief requested.[77]

There is no factual basis in Ms. Crosbie's Amended Complaint to plausibly find that Ms. McKinney has the authority to reinstate her from the office of general counsel. Ms. Crosbie alleges that Ms. Cantwell and Ms. Sabau terminated her employment and that Ms. McKinney only provided advice during the process.[78] This indicates that the University President and Athletic Director have hiring and firing authority over Ms. Crosbie's position, but general counsel does not. Thus, Ms. Crosbie fails to state a claim for prospective relief against any of the Administration Defendants in their official capacity under § 1983.

---

[74] *See Moore v. Knowles*, 482 F.2d 1069, 1075 (5th Cir. 1973) ("Rule 25(d), however, contemplates substitution during pendency of the suit. Because two defendants were no longer members of the board when suit was filed they were not public officers and not before the court as board members.").
[75] Amended Compl. ¶ 7.
[76] Reply 13.
[77] *See Klein v. Univ. of Kansas Med. Ctr.*, 975 F. Supp. 1408, 1417 (D. Kan. 1997) ("None of the individuals that Klein has sued has the power to provide him with the relief he seeks—reinstatement . . . Therefore, Klein's claims for injunctive relief against the individual defendants in their official capacities are dismissed."); *see also Ex parte Young*, 209 U.S. 123, 157 (1908).
[78] Amended Compl. ¶ 77.

### B.    Qualified Immunity

Defendants next argue that Ms. Cantwell, Ms. Sabau, and Ms. McKinney are entitled to qualified immunity in their individual capacities on each of the three § 1983 claims.[79] "A § 1983 defendant's assertion of qualified immunity is an affirmative defense that creates a presumption that the defendant is immune from suit."[80] To overcome the presumption of qualified immunity, the plaintiff must show that "(1) the defendant's actions violated a constitutional or statutory right, and (2) that the right was clearly established at the time of the defendant's complained-of conduct."[81]

In the context of a qualified immunity defense asserted in a 12(b)(6) motion, the defendants are subjected to a "more challenging standard of review than would apply on summary judgment."[82] The court only analyzes the defendant's actions "*as alleged in the complaint*."[83] When a § 1983 claim is "against multiple individual governmental actors, it is particularly important that the complaint make clear exactly who is alleged to have done what to whom."[84]

In determining whether a right is clearly established for a qualified immunity defense, the Tenth Circuit has said:

> A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right. To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The dispositive question is whether the violative nature of the *particular* conduct is clearly established. Accordingly, the Supreme Court has

---

[79] MTD 26.
[80] *Truman v. Orem City*, 1 F.4th 1227, 1235 (10th Cir. 2021) (quoting *Est. of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1168 (10th Cir. 2020)).
[81] *Id.*
[82] *Id.*
[83] *Id.* (quoting *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014)) (emphasis in original).
[84] *Id.*

> repeatedly admonished circuit courts not to define clearly established law at a high level of generality. Though a case directly on point is not required, existing precedent must have placed the constitutional question regarding the illegality of the defendant's conduct beyond debate. Ordinarily there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.[85]

To overcome qualified immunity here, the facts alleged in the complaint must show for each individual defendant and each § 1983 cause of action that the individual's conduct violated a clearly established right.

### 1.    Liberty Interest (Cause of Action IV)

Ms. Crosbie's first cause of action under § 1983 is her claim that the individual defendants violated her liberty interest in her good name and reputation.[86] A public employee has a "liberty interest in [her] good name and reputation as it affects [her] protected property interest in continued employment."[87] In *Workman v. Jordan*, the Tenth Circuit set out a four-part test to establish a liberty interest violation.[88] To be actionable as liberty interest violations, statements must (1) "impugn the good name, reputation, honor, or integrity of the employee," (2) "be false," (3) "occur in the course of terminating the employee" and "foreclose other employment opportunities," and (4) "be published."[89] Once a liberty interest is implicated, a plaintiff must show that they were "not afforded an adequate name-clearing hearing."[90]

---

[85] *Ullery v. Bradley*, 949 F.3d 1282, 1291 (10th Cir. 2020) (internal citations omitted) (emphasis in original).
[86] Amended Compl. ¶¶ 167–68.
[87] *Workman v. Jordan*, 32 F.3d 475, 480 (10th Cir. 1994).
[88] *Id.*
[89] *Id.* at 481.
[90] *Id.* at 480.

### a.    Ms. Cantwell and Ms. McKinney

Ms. Crosbie includes three statements in her Amended Complaint that she contends could form the basis for a liberty interest violation. First, Ms. Cantwell and Ms. Sabau made a statement that Mr. Bovee had been terminated for "violations of university policies related to the reporting of sexual and domestic violence" and "failures of professional responsibilities."[91] Second, Ms. Sabau made a statement in the context of the firings that her actions were done "so that there is not a pervasive culture of sexual violence or domestic violence within any of our athletic departments."[92] Third, Ms. Sabau referred to Ms. Crosbie and Mr. Bovee and said "good people make bad mistakes."[93]

As an initial matter, the first statement about Mr. Bovee's termination cannot form the basis of a liberty violation against Ms. Crosbie. It could not have impugned her good name because it did not reference her at all. Because Ms. Cantwell is only alleged to have participated in making that particular statement and Ms. McKinney is not alleged to have made any of the above statements, Plaintiff cannot show that either of them violated her liberty interest. Both Ms. Cantwell and Ms. McKinney are entitled to qualified immunity against the liberty interest claim.

### b.    Ms. Sabau

The two remaining statements were made by Ms. Sabau to the Fox13 and Salt Lake Tribune news outlets in July 2024.[94] The Complaint only excerpts portions of the statements and does not include as exhibits the articles in which they were made. In their Motion to Dismiss, Defendants cite and include links to the articles themselves and ask the court to review the

---

[91] Amended Compl. ¶ 100.
[92] *Id.* ¶ 101.
[93] *Id.* ¶ 103.
[94] *Id.* ¶¶ 101, 103.

statements in their entirety in the context in which they were made.[95] "Generally, a court should consider no evidence beyond the pleadings on a Rule 12(b)(6) motion to dismiss."[96] However, a court "may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity."[97]

In this case, the allegedly unconstitutional statements and the news articles in which they were published are certainly central to Ms. Crosbie's claim that these statements violated her liberty interest. A statement is only actionable as a liberty interest violation if it is published, so the published statement itself must be examined to determine if it impugns an employee's good name. Additionally, Ms. Crosbie never disputed the validity of the news articles containing Ms. Sabau's statements in her Opposition, even after the articles were extensively referenced in the Motion to Dismiss.[98] Therefore, the court will consider the complete statements made by Ms. Sabau and the context in which they were made.

First, the Amended Complaint states that "Sabau told Fox13 that Bovee and Crosbie were fired 'so that there is not a pervasive culture of sexual violence or domestic violence within any of our athletic departments.'"[99] But she plainly did not. Sabau's actual statement as published in the Fox13 article reads, "[s]etting a new trajectory in accountability and transparency so that there is not a pervasive culture of sexual violence or domestic violence within any of our athletic departments." [sic][100]

---

[95] MTD 34–35.
[96] *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007).
[97] *Id.* (quoting *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002)).
[98] *See* Opp'n 20–23.
[99] Amended Compl. 101.
[100] Mythili Gubbi, *Change is hard; Utah State attempts to clear air surrounding Anderson dismissal*, FOX13 (July 26, 2024), https://www.fox13now.com/sports/change-is-hard-utah-state-attempts-to-clear-air-surrounding-anderson-dismissal [https://perma.cc/N4YR-L4HS].

Notably, this statement does not reference Ms. Crosbie at all. The context in which it was made likewise does not impugn Ms. Crosbie's good name or reputation. The article only reports that Ms. Crosbie was dismissed and then explicitly states that "Sabau would not comment on why Crosbie was let go or confirm if it was connected to the issues surrounding the others."[101] In short, Plaintiff's characterization of the statement is clearly wrong. Because Ms. Sabau's published statement is not about Ms. Crosbie, it cannot impugn her character and cannot form the basis for a liberty violation.

Second, the Amended Complaint states that "Sabau reference[d] both Mr. Bovee and Ms. Crosbie when she told the Salt Lake Tribune, 'good people make bad mistakes.'"[102] This statement was published in a July 29, 2024, Salt Lake Tribune article."[103] The article states, "Sabau also provided no additional information on the specific terminations of both Bovee and Crosbie. She did, however, say that 'good people make bad mistakes' but wants the athletic department to have better accountability and integrity moving forward."[104]

Essentially, this statement implies that Ms. Crosbie was fired for making "bad mistakes." The court need not decide if the statement might constitute a liberty violation under the *Workman* elements because Plaintiff has not shown a clearly established right. To be sure, the right to be free generally from liberty violations is well established,[105] but courts have been "repeatedly admonished" to not "define clearly established law at a high level of generality."[106]

---

[101] *Id.*
[102] Amended Compl. ¶ 103.
[103] Jason Batacao, *Former and current Utah State athletes sign letter demanding 'independent investigation' for terminated athletic administrators*, SALT LAKE TRIBUNE (July 29, 2024), https://www.sltrib.com/sports/utah-state-sports/2024/07/29/former-current-utah-state-athletes/ [https://perma.cc/74HZ-CXBB].
[104] *Id.*
[105] *See Workman v. Jordan*, 32 F.3d 475, 480 (10th Cir. 1994).
[106] *Ullery v. Bradley*, 949 F.3d 1282, 1291 (10th Cir. 2020) (quoting *Kisela v. Hughes*, 584 U.S. 100, 103 (2018)).

A case that is directly on point is unnecessary, but "existing precedent must have placed the constitutional question regarding the illegality of the defendant's conduct beyond debate."[107]

Here, Plaintiff has not produced any such precedent. The most relevant case that Plaintiff cites is *McDonald v. Wise*, a Tenth Circuit opinion where statements that an employee was terminated for "serious misconduct" were sufficient to qualify as a liberty interest violation.[108] Though statements about "serious misconduct" might be read to be somewhat conceptually similar to a statement about "bad mistakes," it is not enough to place the constitutionality of Ms. Sabau's conduct beyond debate. Considered alone, a "bad mistake" might arguably be expansive enough to include dishonesty or immorality that would impugn a person's reputation, but it more naturally relates to negligence, insubordination, or dereliction, which do not tarnish a person's good name under Tenth Circuit precedent.[109] Indeed, "mistake" is most consistent with inadvertence, while "misconduct" is more consistent with an intentional act.[110] Additionally, the "bad mistake" language is only part of the whole statement—"good people make bad mistakes." The statement must be considered in its entirety. Considering the part without the whole obscures rather than illuminates how the statement would be understood.

Plaintiff has produced no precedent or caselaw demonstrating "beyond debate" that this statement illegally impugned her good name. The court cannot find that it plausible that "every

---

[107] *Id.*
[108] *McDonald v. Wise,* 769 F.3d 1202, 1209, 1212 (10th Cir. 2014); Opp'n 21 n.92.
[109] *See Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988) (Charges of dishonesty or immorality could implicate a liberty interest, but charges of negligence, insubordination, horseplay, tardiness, and unreliability do not.)
[110] *See Mistake,* MERRIAM-WEBSTER DICTIONARY (11th ed.), https://www.merriam-webster.com/dictionary/mistake [https://perma.cc/K4H9-ZE5A] (defining "mistake" as "a wrong action or statement proceeding from faulty judgment, inadequate knowledge, or inattention"); *but see Misconduct,* MERRIAM-WEBSTER DICTIONARY (11th ed.), https://www.merriam-webster.com/dictionary/misconduct [https://perma.cc/J7BT-SCYW] (defining "misconduct" as "deliberate violation of a law or standard especially by a government official" and "improper behavior").

reasonable official would have understood that what [s]he is doing violates that right."[111] Ms. Sabau is entitled to qualified immunity on this claim.

### 2.    Procedural Due Process (Cause of Action V)

Ms. Crosbie's second cause of action under § 1983 is her claim that the individual defendants deprived her of her property interest in continued employment without procedural due process.[112] Specifically, she alleges that her employment was terminated without pretermination notice and opportunity to respond or improve and that her post-termination hearing was deficient.[113] When a person has a property right in continued employment, the state cannot deprive them of that property right without due process.[114] In *Cleveland Board of Education v. Loudermill*, the Supreme Court explained that due process requires pretermination notice and opportunity to respond along with a post-termination hearing.[115] In this case, Defendants do not dispute that Ms. Crosbie had a protected property interest in her employment.[116]

### a.    Pre-Termination Process

In *Loudermill*, the Court explained that the Due Process Clause requires "that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest."[117] A pretermination hearing need not be elaborate. The Tenth Circuit has found that even a brief face-to-face meeting with a supervisor immediately prior to termination satisfies the

---

[111] *Ullery v. Bradley*, 949 F.3d 1282, 1291 (10th Cir. 2020).
[112] Amended Compl. ¶¶ 176–78.
[113] *Id.*
[114] *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985).
[115] *Id.* at 542.
[116] MTD 28.
[117] *Loudermill*, 470 U.S. at 542 (quoting *Boddie v. Connecticut,* 401 U.S. 371, 379 (1971)).

*Loudermill* pretermination requirements.[118] Still, an employer must provide the "*minimal* pre-termination procedural protections noted in *Loudermill*," which "requires the employer to provide—*before the termination*—notice of the charges, a summary of the employer's evidence, and an opportunity to respond."[119]

Here, Ms. Crosbie alleges that USU, upon a decision by Ms. Cantwell and Ms. Sabau, terminated her employment effective immediately without any prior discipline, opportunity to respond, or prior notice.[120] Instead, Ms. Sabau gave Ms. Crosbie a letter describing the reasons for her termination.[121] Defendants respond that Ms. Crosbie received sufficient pretermination process because the termination letter and a termination email gave her notice of the allegations and because she received the letter in an in-person meeting with opportunity to respond.[122]

When deciding the issue of qualified immunity on a motion to dismiss, the court "only analyzes the defendant's actions "*as alleged in the complaint*.""[123] Defendants refer to an in-person meeting and include a termination email that are not mentioned in or attached to Ms. Crosbie's Amended Complaint.[124] Accordingly, the court will not consider the attached termination email or Defendants' arguments about an in-person meeting at this stage.[125]

---

[118] *West v. Grand Cnty.*, 967 F.2d 362, 368 (10th Cir. 1992).

[119] *Montgomery v. City of Ardmore*, 365 F.3d 926, 937 (10th Cir. 2004) (emphasis in original).

[120] Amended Compl. ¶¶ 77–80.

[121] *Id.* ¶ 78.

[122] MTD 29.

[123] *Truman v. Orem City*, 1 F.4th 1227, 1235 (quoting *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014)) (emphasis in original).

[124] *See generally,* Amended Compl.; MTD 29.

[125] Defendants include an exhibit that they refer to as the "termination letter." ECF No. 17-8. However, this exhibit actually shows a termination email and is distinct from the termination letter that Plaintiff describes in her Amended Complaint at paragraphs 78–83.

Because Ms. Crosbie alleges facts suggesting that Ms. Cantwell and Ms. Sabau terminated her without providing any notice or opportunity to respond,[126] she has plausibly pled that their actions violated her right to pretermination procedural due process. However, the Amended Complaint only alleges that Ms. McKinney provided advice on Ms. Crosbie's termination.[127] Absent any allegations that Ms. McKinney deprived Plaintiff of a property interest by terminating her employment, the Amended Complaint does not allege that she violated Ms. Crosbie's procedural due process rights. Ms. McKinney is entitled to qualified immunity against the procedural due process claim.

As for the remaining Administration Defendants, Ms. Crosbie has also shown that the right in question is clearly established.[128] The Amended Complaint includes facts and allegations showing that Ms. Crosbie was terminated effective immediately upon receiving her termination letter and that she had no warning, notice, or opportunity to respond prior to her dismissal.[129] Taking these factual allegations as true, as the court must on a motion to dismiss, Ms. Crosbie has plausibly pled that her pretermination due process rights were violated.[130] A reasonable official would have known that terminating an employee without any of the pretermination due process procedures set forth in *Loudermill* was "constitutionally inadequate."[131] Therefore, Plaintiff has sufficiently pled that Ms. Cantwell and Ms. Sabau violated her clearly established

---

[126] Amended Compl. 77.
[127] *Id.*
[128] Opp'n 14.
[129] Amended Compl. ¶¶ 77–80.
[130] Tenth Circuit precedent also supports this conclusion. In *Lovingier v. City of Black Hawk*, an unpublished decision, the Tenth Circuit found that an employee's pretermination due process rights are violated under the *Loudermill* standard when he is terminated "effective immediately" via a written notice of dismissal without prior notice. *Lovingier v. City of Black Hawk*, 198 F.3d 258 (10th Cir. 1999) (unpublished).
[131] *See Calhoun v. Gaines*, 982 F.2d 1470, 1476 (10th Cir. 1992).

right to pretermination procedural due process. They are not entitled to qualified immunity on this aspect of Ms. Crosbie's procedural due process § 1983 claim.

### b.    Post-Termination Process

In addition to some form of simple pretermination hearing, *Loudermill* also requires "a full-blown adversarial post-termination hearing"[132] before an impartial tribunal.[133] "A 'full posttermination hearing' is understood to include the right to representation by an attorney and the right to cross-examine adverse witnesses."[134] In this case, Ms. Crosbie received a two-day grievance hearing in front of a committee in which she faced witnesses and was represented by counsel.[135] Nevertheless, she alleges that the hearing was constitutionally deficient because (1) she was not permitted to discuss her retaliation claims or present evidence of Ms. Sabau's bullying, (2) her attorney was not allowed to present her case, and (3) questioning the witnesses was done indirectly through the committee instead of through an attorney.[136]

To overcome qualified immunity, a plaintiff must first show that the individual defendant's actions violated a constitutional or statutory right."[137] This is because the "plain wording of the [§ 1983] statute contains an element of causation."[138] Under the statute, a defendant can only be liable if he or she personally "subjected a citizen to the deprivation, or caused a citizen to be subjected to the deprivation."[139]

---

[132] *Id.*
[133] *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 518 (10th Cir. 1998).
[134] *Workman v. Jordan*, 32 F.3d 475, 480 (10th Cir. 1994).
[135] Amended Compl. ¶¶ 111, 114.
[136] *Id.* ¶¶ 111–15, 178.
[137] *Truman v. Orem City*, 1 F.4th 1227, 1235 (10th Cir. 2021).
[138] *Tonkovich*, 159 F.3d at 518.
[139] *Id.*

All of Ms. Crosbie's claims for violations of her post-termination due process rights stem from how her grievance hearing was conducted. But in her Amended Complaint, she alleges that the relevant actions were all taken by USU or the hearing committee.[140] She states that "USU determined that it would exclude from consideration all evidence and argument related to Ms. Crosbie's claims of retaliation" and that "USU limited Ms. Crosbie's attorney from fully representing her."[141] Notably absent is any fact or allegation connecting any of the Administration Defendants to the hearing. The Amended Complaint does not allege that Ms. Cantwell, Ms. Sabau, or Ms. McKinney made, participated in, or contributed to any of the disputed committee decisions. Ms. Crosbie points to no facts in the Amended Complaint from which it could plausibly be inferred that these defendants played any role at all in the grievance hearing or the alleged due process violations that allegedly arose from it.

Because Plaintiff has not shown or alleged that they violated her post-termination due process rights, Ms. Cantwell, Ms. Sabau, and Ms. McKinney are entitled to qualified immunity on this part of Ms. Crosbie's procedural due process claim.

### 3.    Substantive Due Process (Cause of Action VI)

Ms. Crosbie's third cause of action under § 1983 is her claim that the individual defendants deprived her of her property interest in continued employment without substantive due process.[142] Substantive due process rights arise from the Fourteenth Amendment Due Process Clause and "bar 'certain government actions regardless of the fairness of the procedures

---

[140] Amended Compl. ¶¶ 112–15.
[141] Id.
[142] Id. ¶¶ 185–86.

used to implement them.'"[143] "[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense," so a substantive due process violation is characterized by an abuse of governmental authority that "shocks the conscience."[144] Such a claim "requires a showing of government officials abusing their power, or employing it as an instrument of oppression."[145]

"A public employee with a property interest in continued employment has a substantive-due-process right not to be terminated for arbitrary or capricious reasons."[146] To overcome qualified immunity here, Ms. Crosbie must show that each individual defendant deliberately and arbitrarily deprived her of her property interest in continued employment and that existing precedent has established that the defendant's actions were so egregious that they shock the conscience.[147]

The Amended Complaint alleges that "Defendants deprived Ms. Crosbie of her property interest by terminating her employment without substantive due process."[148] As to the involvement of the individual defendants, it states that the "individual Defendants' active involvement in impugning Ms. Crosbie's good name, reputation, honor, and integrity as a scapegoat for their own failures deprived Ms. Crosbie of her constitutional liberty interest."[149] Ms. Crosbie argues that she was arbitrarily and deliberately deprived of her property interests because (1) she was terminated for improper motives, (2) she was fired based on an erroneous

---

[143] *Williams v. Berney*, 519 F.3d 1216, 1220 (10th Cir. 2008) (quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 840, 846 (1998)).
[144] *Id.*
[145] *Id.*
[146] *Darr v. Town of Telluride, Colo*, 495 F.3d 1243, 1257 (10th Cir. 2007).
[147] *See Moore v. Univ. of Kansas,* 118 F. Supp. 3d 1242, 1263 (D. Kan. 2015).
[148] Amended Compl. ¶ 186.
[149] *Id.* ¶¶ 190.

report without having access to that full report, and (3) USU policy 399.3 allows for termination based on enumerated reasons as well as other reasons deemed valid by USU administration.[150]

First, as the court has already discussed, Ms. Crosbie's § 1983 claims for violations of her liberty interest fail because the statements either did not impugn her or were not clearly established by precedent as constitutional violations. Because the statements allegedly impugning Ms. Crosbie's name are insufficient to overcome qualified immunity, they also cannot form the basis for her substantive due process claim. The latter would necessarily require that Ms. Crosbie's liberty interest was violated in a clearly established and conscience-shocking manner.

Second, as has been stated, the Amended Complaint alleges no facts indicating that Ms. McKinney deprived Ms. Crosbie of a property interest at all, much less that she did so arbitrarily. Ms. McKinney is therefore entitled to qualified immunity against the substantive due process claim, as well as against the other § 1983 claims. Having dispensed with these preliminary matters, the court must now decide based on the facts alleged (1) whether Ms. Cantwell and Ms. Sabau terminated Ms. Crosbie arbitrarily and (2) whether existing precedent had established that their actions would be so egregiously arbitrary as to shock the conscience.[151]

### a.    Conscience-Shocking Actions

Ms. Crosbie argues in her Opposition that she was fired for improper reasons, namely in retaliation for reporting Ms. Sabau's mistreatment and to cover up USU's own reporting failures.[152] These allegations do not appear in her sixth cause of action, which focuses on USU

---

[150] Opp'n 18–19.
[151] *See Moore,* 118 F. Supp. 3d at 1263.
[152] Opp'n 18–19.

policy 399 and the Administration Defendants' alleged violation of Ms. Crosbie's liberty interest.[153] Furthermore, the Amended Complaint does not allege facts plausibly showing that Ms. Crosbie was fired in retaliation or as part of a cover-up.

The Amended Complaint quotes Ms. Crosbie's termination letter as explaining that she was fired for "failure to comply with the terms and spirit of USU Policy 340" when she did not disclose the existence of a witness statement.[154] After quoting the termination letter, Plaintiff concludes that "USU terminated Ms. Crosbie because she disclosed the existence of the witness statement when USU (through Husch Blackwell) finally interviewed her about the IR rather than when she was first shown the statement."[155] The Amended Complaint itself establishes that Ms. Crosbie informed investigators about the witness statement during their interview.[156]

"Substantive due process requires that the termination of a [protected] property interest not be arbitrary, capricious, or without a rational basis."[157] In this case, the Amended Complaint alleges that Ms. Cantwell and Ms. Sabau terminated Ms. Crosbie's property interest, but the facts show that they did so because they believed she had violated university policy. It is not arbitrary, irrational, or shocking to the conscience to fire an employee after a months-long investigation concludes that the employee violated university policies. Even accepting as true Ms. Crosbie's allegations that the report was inaccurate in some respects,[158] that does not make the university's reliance on the report arbitrary.

---

[153] Amended Compl. ¶¶ 184–92.
[154] *Id.* ¶¶ 81–83.
[155] *Id.* ¶ 84.
[156] *Id.* ¶ 61.
[157] *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 528 (10th Cir. 1998).
[158] *See* Amended Compl. ¶ 85; Opp'n 18.

Ms. Crosbie argues that she was actually fired as a scapegoat to cover up USU's own reporting failures and in retaliation for reporting Ms. Sabau's abusive treatment.[159] But the Amended Complaint's factual allegations do not plausibly support this argument. The Amended Complaint alleges that Ms. Crosbie complained about Ms. Sabau to HR[160] and that the grievance committee and a DOJ investigation both criticized the OOE and USU's reporting procedures.[161] It does not connect these facts to Ms. Crosbie's termination. There is no allegation that Ms. Sabau even knew about Ms. Crosbie's HR complaints. Furthermore, the fact that USU and the OOE had implemented poor reporting procedures does not make it arbitrary and conscience shocking to terminate an employee for violating university policies.

Ms. Crosbie also argues that the defendants' most shocking action was their enforcement of USU policy 399.3, which broadly allows USU to fire employees for "reasons deemed valid by university administration."[162] The Complaint states that the committee criticized this policy, finding that, though Ms. Crosbie's termination was unwarranted, policy 399 left no choice but to uphold her removal.[163]

However, Plaintiff does not explain how Ms. Sabau and Ms. Cantwell "enforced" this policy. There are no facts showing that they created it or used it as a reason for terminating her employment. While the policy may have limited Ms. Crosbie's ability to effectively appeal her termination, its mere existence does not render the decision to terminate Ms. Crosbie for policy violations arbitrary and conscience shocking. Ms. Crosbie has not shown that Ms. Cantwell's and

---

[159] Amended Compl. ¶ 132; Opp'n 18.
[160] Amended Compl. ¶ 72.
[161] *Id.* ¶¶ 119, 131.
[162] Opp'n 19.
[163] Amended Compl. ¶¶ 123–26.

Ms. Sabau's actions in firing her based on the report shock the conscience, so she has not shown that they violated her substantive due process rights by terminating her employment.

### b.    Clearly Established

Even if Ms. Crosbie had alleged facts showing that the Administration Defendants violated her substantive due process rights, she has not shown that those rights were clearly established. Plaintiff cites no Tenth Circuit or Supreme Court authority to show that the "violative nature" of Ms. Cantwell's and Ms. Sabau's "*particular* conduct [was] clearly established."[164] She does reference two district court wrongful termination cases. The first, *Gale v. Uintah County*, found that terminating an employee for a minor offense shortly after he engaged in political campaigning that his supervisors disliked could suggest a substantive due process violation.[165] The second, *Anglemyer v. Hamilton County Hospital,* found that terminating a risk management employee for refusing to overlook reportable violations in the workplace could be a substantive due process violation.[166]

These cases are not binding precedent. Even if they were, they involve different conduct than that alleged here. They do not place "beyond debate" that conduct like terminating an employee for a policy violation based on erroneous conclusions in an official report shocks the conscience. They also do not clearly establish that the existence of a broad institutional policy that permits dismissal for any reason deemed valid by the administration makes all termination decisions within that institution arbitrary. Plaintiff has not identified any precedent that even suggests these principles, so the violative nature of Ms. Cantwell's and Ms. Sabau's conduct has

---

[164] *Ullery v. Bradley*, 949 F.3d 1282, 1291 (10th Cir. 2020) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (emphasis in original).
[165] *Gale v. Uintah Cnty.*, No. 2:13-CV-725-TC, 2015 WL 4645024, at *16 (D. Utah Aug. 4, 2015).
[166] *Anglemyer v. Hamilton Cnty. Hosp.*, 848 F. Supp. 938, 939 (D. Kan. 1994).

not been clearly established. They are entitled to qualified immunity on Ms. Crosbie's substantive due process claim.

## II.    State Law Claims (Causes of Action I, II, III)

Ms. Crosbie also asserts causes of action for violations of her liberty interest and property interest without procedural and substantive due process under Article I, Section 7 of the Utah Constitution.[167] Article I, Section 7 states that "[n]o person shall be deprived of life, liberty or property, without due process of law."[168] Plaintiff asserts each state constitutional claim against USU and against Ms. Cantwell, Ms. Sabau, and Ms. McKinney individually and in their official capacities.

### A.    Sovereign Immunity

Defendants argue that the doctrine of sovereign immunity precludes Plaintiff's claims against USU and the defendants in their official capacities because the state of Utah has not waived its immunity for constitutional claims.[169] Ms. Crosbie responds that, except for the Utah Takings Clause, Utah courts have never directly addressed the issue of sovereign immunity from constitutional claims.[170] She contends that prior Utah Supreme Court cases nevertheless indicate that "the State cannot be immune from suit for constitutional due process claims."[171]

The Utah Supreme Court has stated that, "[i]n the absence of applicable constitutional or statutory authority, Utah courts employ the common law" to determine when damages may be available for a constitutional violation.[172] Utah's sovereign immunity under common law was

---

[167] Amended Compl. ¶¶ 134–65.
[168] Utah Const. art. I, § 7.
[169] MTD 19.
[170] Opp'n 7.
[171] *Id.* at 8.
[172] *Spackman ex rel. Spackman v. Bd. of Educ. of Box Elder Cnty. Sch. Dist.*, 2000 UT 87, ¶ 20, 16 P.3d 533, 537.

described less than twenty years after the Utah Constitution was adopted when the Utah Supreme Court explained that "in the absence of either express constitutional or statutory authority an action against a sovereign state cannot be maintained. The doctrine is elementary and of universal application, and so far as we are aware there is not a single authority to the contrary."[173] The Utah Supreme Court has repeatedly relied on this principle, reaffirming that "[s]overeign immunity was a settled feature of the common law when Utah became a state and adopted its constitution."[174]

In *Colman v. Utah State Land Board*, the Utah Supreme Court addressed the issue of sovereign immunity in the context of Article I, Section 22, the Takings Clause, of the Utah Constitution.[175] There, the Court held that the State is not immune to suit under the Takings Clause.[176]  The Court explained:

> The people of Utah established the Utah Constitution as a limitation on the power of government. It can hardly be maintained that the doctrine of sovereign immunity, alone among all doctrines, is outside of the limitations the people established.[177]

Plaintiff argues that this rationale should be applied to allow suits against the State under the Due Process Clause.[178] But *Colman* also discusses how the Takings Clause is unique in that it expressly grants a right to damages in the form of "just compensation,"[179] ultimately concluding

---

[173] *Wilkinson v. State*, 42 Utah 483, 134 P. 626, 630 (1913).
[174] *Tiede v. State*, 915 P.2d 500, 504 (Utah 1996); *see also See Davey v. Blood,* No. 2:23-CV-442-AMA, 2024 WL 3728072, at *3 (D. Utah Aug. 7, 2024).
[175] *Colman v. Utah State Land Bd*., 795 P.2d 622, 634 (Utah 1990).
[176] *Id.* at 635.
[177] *Id.* at 634.
[178] Opp'n 7–8.
[179] *Colman*, 795 P.2d at 631–32.

that "article I, section 22 needs no legislation to activate it; it is mandatory and obligatory as it is."[180]

In *Spackman ex rel. Spackman v. Board of Education of Box Elder County School District*, the Utah Supreme Court noted that, "sovereign immunity does not apply to constitutional takings claims."[181] It also explained that "[e]xcept for the Takings Clause, the Utah Constitution does not expressly provide damage remedies for constitutional violations."[182] The Court then established a test for determining when a court may award damages for violations of self-executing constitutional provisions under the common law.[183]

The *Spackman* test only addresses "the potential liability of individual municipal employees" for violations of the Utah Constitution.[184] The Utah Supreme Court later clarified that a plaintiff may bring a suit against a municipality for damages stemming from constitutional violations as well.[185] However, the Utah Supreme Court has not said that a plaintiff can bring a suit for damages against the State itself for the violation of any state constitutional provision except the Takings Clause. As noted earlier, Utah common law has always recognized that sovereign immunity prevents actions against the state without its consent.[186] Because no statute, constitutional provision, or Utah Supreme Court case has ever recognized the waiver of this immunity with regard to constitutional claims against the state except under the Takings Clause, the State is immune from Plaintiff's claims under the Utah Constitution.

---

[180] *Id.* at 635.
[181] *Spackman ex rel. Spackman v. Bd. of Educ. of Box Elder Cnty. Sch. Dist.*, 2000 UT 87, ¶ 20, 16 P.3d 533, 537 n.7.
[182] *Id.*
[183] *Id.* at 537–39.
[184] *Kuchcinski v. Box Elder Cnty.*, 2019 UT 21, ¶ 25, 450 P.3d 1056, 1065.
[185] *Id.*
[186] *See Tiede v. State*, 915 P.2d 500, 504 (Utah 1996).

Other judges in this district have reached the same conclusion. In *Davey v. Blood*, the court concluded that, although plaintiffs may seek "money damages against municipalities and individual state employees and officers for their violations of Utah's Constitution . . . the State of Utah has not waived and still retains its sovereign immunity for almost all state constitutional violations."[187] The court then dismissed the plaintiffs' claims against the State under the Unnecessary Rigor Clause of the Utah Constitution as barred by sovereign immunity.[188] Similarly, the court in *P.J. ex rel. Jensen v. Utah* held that sovereign immunity barred the plaintiffs' Utah constitutional claims against the State, including a claim under the Due Process Clause.[189] There is no reason to hold differently in this case. Ms. Crosbie's Utah Constitution claims for damages against USU and the Administration Defendants in their official capacities are barred by sovereign immunity.

**B.    *Spackman* Analysis**

Plaintiff also asserts her Utah due process claims against Ms. Cantwell, Ms. Sabau, and Ms. McKinney as individuals.[190] As noted earlier, in *Spackman*, the Utah Supreme Court established a test for determining whether money damages are available against government employees for constitutional violations.[191] The Court found that the Due Process Clause of the Utah Constitution is self-executing.[192] Therefore, to show that monetary damages are available for a Due Process Clause violation, a plaintiff must establish that (1) "he or she suffered a 'flagrant' violation of his or her constitutional rights," (2) "existing remedies do not redress his

---

[187] *Davey v. Blood*, No. 2:23-CV-442-AMA, 2024 WL 3728072, at *6 (D. Utah Aug. 7, 2024).
[188] *Id.* at *7.
[189] *P.J. ex rel. Jensen v. Utah*, No. 2:05CV00739 PGC, 2006 WL 1702585, at *2 (D. Utah June 16, 2006).
[190] Amended Compl. ¶¶ 134–65.
[191] *Spackman ex rel. Spackman v. Bd. of Educ. of Box Elder Cnty. Sch. Dist.*, 2000 UT 87, ¶ 20, 16 P.3d 533, 537.
[192] *Id.*

or her injuries," and (3) "equitable relief, such as an injunction, was and is wholly inadequate to protect the plaintiff's rights or redress his or her injuries."[193] Defendants argue that Ms. Crosbie cannot satisfy the first two prongs of the *Spackman* test.[194] They also contend that the Amended Complaint does not plead sufficient non-conclusory factual allegations to support the Utah Constitutional claims against each individual defendant.[195]

To establish that she suffered a flagrant violation of her state constitutional rights, a plaintiff must show that the defendant "violated 'clearly established' constitutional rights 'of which a reasonable person would have known.'"[196] "To be considered clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"[197] This standard mirrors the federal "clearly established" requirement for overcoming qualified immunity in § 1983 claims.[198]

The second element of the *Spackman* test requires courts to "defer to relevant legislative determinations of appropriate remedies" when they exist.[199] Courts have dismissed state constitutional claims for failure to meet the second *Spackman* element when the plaintiff also has overlapping § 1983 claims that address the same conduct in the context of the federal Constitution.[200] However, courts generally allow both § 1983 and state constitutional claims to

---

[193] *Id.* at 538–39.
[194] MTD 22.
[195] *Id.* at 23.
[196] *Spackman*, 16 P.3d at 538 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)).
[197] *Id.* (quoting *Anderson v. Creighton,* 483 U.S. 635, 639–40 (1987)).
[198] *See id.* (using language from U.S. Supreme Court cases about qualified immunity).
[199] *Id.* at 539.
[200] *See Nielson v. City of S. Salt Lake,* No. 2:06-CV-335-CW, 2009 WL 3562081, at *9 (D. Utah Oct. 22, 2009) ("the second element requires Nielson to show that existing remedies under § 1983 do not redress her injuries."); *Cavanaugh v. Woods Cross City*, No. 1:08-CV-32-TC-BCW, 2009 WL 4981591, at *6 (D. Utah Dec. 14, 2009), aff'd, 625 F.3d 661 (10th Cir. 2010) ("Plaintiffs cannot state a claim for damages under the Utah Constitution because their injuries can be fully redressed through their 42 U.S.C. § 1983 claim.").

proceed at the motion to dismiss stage.[201] This is because the court has "limited information about any overlap between a plaintiff's state and federal claims," so it would be "premature to determine which claim might be meritorious."[202]

These essential elements of the *Spackman* test must be alleged in the complaint itself.[203] It is insufficient for a plaintiff to merely allege that a state constitutional violation occurred without also plausibly alleging that the violation was flagrant, that alternative remedies do not address it, and that equitable relief is inadequate.[204] "When these elements are not set forth in the complaint, dismissal for failure to state a claim is proper."[205]

### 1.  Liberty Interest (Cause of Action I)

Ms. Crosbie's first claim under the Utah Due Process Clause is that she was deprived of her liberty interest to "pursue her chosen occupation" and "avoid stigma and reputational harm that forecloses future employment opportunities."[206] The claim does not include any allegations explaining how the individual defendants' conduct violated this right, only generally stating that "the Defendants' conduct in relation to the termination of Ms. Crosbie . . . caused significant reputational harm."[207] However, even assuming that Ms. Crosbie's state constitution liberty claim rests on the same "stigmatic" statements alleged in her federal liberty interest claim, it fails under the *Spackman* test.

---

[201] *Finlinson v. Millard Cnty.*, 455 F. Supp. 3d 1232, 1244 (D. Utah 2020).

[202] *Id.*; *but see Hoggan v. Wasatch Cnty.,* No. 2:10CV01204-DS, 2011 WL 3240510, at *2 (D. Utah July 28, 2011) (Dismissing state constitutional claims on a motion for judgment on the pleadings because overlapping § 1983 claims also exist).

[203] *Am. W. Bank Members, L.C. v. State*, 2014 UT 49, ¶ 40, 342 P.3d 224, 237.

[204] *Id.* ("To survive a rule 12(b)(6) motion, the plaintiff also must allege that the violation was 'flagrant,' that alternative remedies would not redress the plaintiff's damages, and that equitable relief was 'wholly inadequate.'").

[205] *Hansing v. Utah Dep't of Nat. Res.*, No. 2:24-CV-480 DBP, 2025 WL 1676532, at *8 (D. Utah June 13, 2025).

[206] Amended Compl. ¶ 135.

[207] *Id.* ¶ 136.

The Utah Supreme Court has noted that "[t]he due process clause of the state constitution is substantially the same as the Fifth and Fourteenth amendments to the Federal Constitution."[208] Therefore, "decisions of the Supreme Court of the United States on the due process clauses of the Federal Constitution are highly persuasive as to the application of that clause of [the Utah] constitution"[209] In other words, an analysis of questions concerning procedural due process under both the Utah and federal constitutions is "substantially the same."[210] In the context of the "flagrant violation" prong of the *Spackman* test, courts have held that a due process violation that is "clearly established" under the federal Constitution for purposes of qualified immunity is also "flagrant" under the Utah Constitution.[211]

Here, Ms. Crosbie does not provide any Utah precedent to show that the Administration Defendants committed a flagrant violation of her State constitutional rights. Instead, she refers the court to her federal § 1983 arguments that Defendants violated her "clearly established" due process rights.[212] As the court already determined, Ms. Crosbie has not shown that any of the statements attributed to Ms. Cantwell or Ms. Sabau violated her clearly established liberty interest rights. Ms. Crosbie also did not plead facts showing that Ms. McKinney took any actions that would violate her liberty interest. Therefore, she has likewise failed to show that she suffered a flagrant violation under the *Spackman* test. The court need not address the remaining *Spackman* elements. The Amended Complaint does not state a claim for damages against Ms.

---

[208] *Untermyer v. State Tax Comm'n*, 102 Utah 214, 129 P.2d 881, 885 (1942).
[209] *Id.*
[210] *State v. Angilau*, 2011 UT 3, ¶ 13, 245 P.3d 745, 750.
[211] *Am. W. Bank Members v. Utah*, No. 2:16–CV–326–CW–EJF, 2018 WL 734401, at *16 (D. Utah Feb. 6, 2018).
[212] Opp'n 10.

Cantwell, Ms. Sabau, or Ms. McKinney for deprivation of a liberty interest without due process under the Utah Constitution.

### 2.    Procedural Due Process (Cause of Action II)

Ms. Crosbie next claims that she was deprived of her property interest in continued employment without procedural due process.[213] She alleges that Defendants violated her due process by terminating her without pretermination notice and opportunity to respond and without a sufficient post-termination hearing.[214] Defendants argue that she does not support her claim with factual allegations connecting the individual defendants to the alleged violations and that she fails to establish that any violations were flagrant.[215]

Once again, the analysis for Ms. Crosbie's state procedural due process claim overlaps substantially with the analysis of her § 1983 procedural due process claim. As previously explained, the Amended Complaint fails to allege facts to plausibly suggest that the alleged post-termination due process violations are attributable to Ms. Cantwell, Ms. Sabau, or Ms. McKinney. Therefore, Ms. Crosbie does not state a claim for a procedural due process violation of the Utah Constitution against these individual defendants for any post-termination proceedings.

However, Ms. Crosbie did sufficiently plead that Ms. Cantwell and Ms. Sabau violated a clearly established right when they terminated her without any notice or opportunity to respond. Because Ms. Cantwell and Ms. Sabau are not entitled to qualified immunity for their pretermination actions, the court also concludes that Ms. Crosbie has alleged a flagrant violation

---

[213] Amended Compl. ¶ 145.
[214] *Id.* ¶¶ 148–150.
[215] MTD 23–24.

34

under the Utah Constitution for those same actions.[216] Furthermore, Ms. Crosbie expressly pled

sufficient facts that Defendants committed a flagrant violation of the clearly established

constitutional right to due process. Thus, the Amended Complaint not only alleges that a

constitutional violation occurred, it also alleges that the violation was flagrant. This satisfies the

first prong of the *Spackman* test.

Having determined that Ms. Crosbie's Art. I § 7 claim for violation of her pretermination

procedural due process satisfies the first *Spackman* element, the court turns to the second

element.[217] Defendants argue that Ms. Crosbie fails to set forth this essential element in her

Amended Complaint and that her § 1983 claims already adequately redress her alleged

injuries.[218] As was already discussed, courts generally allow both state constitutional and § 1983

claims to proceed at the motion to dismiss stage because there is limited information about how

much they might overlap.[219] Plaintiff argues that she has satisfied the second *Spackman* element

based on this rationale.[220] Because the court lacks sufficient information to know at this stage

whether Ms. Crosbie's § 1983 claims will fully redress her injuries, the inclusion of § 1983

claims does not defeat the second *Spackman* prong.

However, the *Spackman* elements must be set forth in the complaint itself.[221] Though Ms.

Crosbie argues in her Opposition that other remedies do not redress her injuries, no such

allegations are pled in her Amended Complaint. The second cause of action and the Amended

---

[216] *See Am. W. Bank Members v. Utah*, No. 2:16–CV–326–CW–EJF, 2018 WL 734401, at *16 (D. Utah Feb. 6, 2018).
[217] *Spackman*, 16 P.3d at 538–39.
[218] MTD 22, 24.
[219] *Finlinson v. Millard Cnty.*, 455 F. Supp. 3d 1232, 1244 (D. Utah 2020).
[220] Opp'n 10–11.
[221] *Hansing v. Utah Dep't of Nat. Res.*, No. 2:24-CV-480 DBP, 2025 WL 1676532, at *8 (D. Utah June 13, 2025).

Complaint generally are devoid of any allegations or facts showing that only damages under the Utah Constitution can redress her alleged injuries.[222] Ms. Crosbie does not identify in her Opposition any allegations that would satisfy this pleading requirement.[223] As a result, the Amended Complaint does not state a claim for damages against Ms. Cantwell, Ms. Sabau, or Ms. McKinney for deprivation of procedural due process under the Utah Constitution because it fails to set forth all the elements of the *Spackman* test.

### 3. Substantive Due Process (Cause of Action III)

Next, Ms. Crosbie claims that she was deprived of her property interest in continued employment without substantive due process.[224] As before, Plaintiff provides no additional Utah precedent to support a finding that the contours of the right were clearly established, instead relying on her federal § 1983 arguments.[225] Because the court already determined that Ms. Crosbie has not shown a clearly established substantive due process right, this claim also fails under the first prong of the *Spackman* test. Thus, all three of Ms. Crosbie's due process claims for damages under the Utah Constitution against the individual defendants fail because the Complaint does not sufficiently show or allege the *Spackman* elements.

### C. Equitable Relief

Finally, Plaintiff argues that even if she has not sufficiently alleged the *Spackman* elements to maintain an action for damages against the individual defendants, her claims survive because she also requests equitable relief.[226] Ms. Crosbie requests reinstatement as a remedy for

---

[222] *See generally* Amended Compl.
[223] *See generally* Opp'n.
[224] Amended Compl. ¶ 145.
[225] Opp'n 10.
[226] Opp'n 9.

each of her Utah constitutional claims.[227] The court has already addressed very similar equitable relief in the context of Ms. Crosbie's § 1983 claims. As previously noted,  Ms. Cantwell and Ms. Sabau had no official positions with USU at the time the lawsuit was commenced, and Rule 25(d) only provides for substitution of parties when an official leaves office while a suit is pending, not before.[228] And because Ms. Cantwell and Ms. Sabau no longer have positions at USU, they have no authority to reinstate Ms. Crosbie in their individual capacities even if ordered to do so by the court.

As to Ms. McKinney, the Amended Complaint never alleges facts showing that she fired Ms. Crosbie or had authority to do so.[229] It only states that Ms. McKinney advised Ms. Sabau's supervisors during the termination decision.[230] There is no indication that Ms. McKinney, as USU's general counsel, has either official or individual authority to reinstate Ms. Crosbie to her position. Because Plaintiff's requested equitable relief cannot be granted by any of the individual defendants, her Utah constitutional claims cannot survive based on it alone.

## III.    Breach of Contract (Cause of Action VII)

In her Amended Complaint, Ms. Crosbie states that, during her employment, USU and its employees were jointly bound by USU's Human Resources Policies.[231] Ms. Crosbie alleges that these policy provisions created an implied-in-fact contract between her and USU.[232] The relevant

---

[227] Amended Compl. ¶¶ 141, 155, 164.
[228] Fed. R. Civ. P. 25(d); *see also Mire v. Bd. of Supervisors of Louisiana State Univ.,* No. CV 15-6965, 2017 WL 785439, at *4 (E.D. La. Mar. 1, 2017).
[229] Amended Compl. ¶ 77.
[230] *Id.*
[231] *Id.* ¶ 28.
[232] *Id.* ¶ 196.

provisions are referenced in the Amended Complaint, central to several of Plaintiff's claims, and undisputed by the parties, so the court will consider them.[233]

Ms. Crosbie alleges that USU violated (1) Policy 305 by retaliating against her for making a Title IX report, (2) Policies 311 and 399 by dismissing her without progressive discipline and without letting her resign in lieu of termination, and (3) Policy 321 by retaliating against her for reporting Ms. Sabau's abusive conduct and not investigating that conduct.[234] Defendants respond by arguing that these provisions do not constitute an implied contract and that, even if they do, the Amended Complaint does not allege facts to plausibly show that USU breached their contractual terms.[235]

### A.    Existence of Implied Contractual Provision

In Utah, "generally, employment of public employees is 'governed by statute, not contract.'"[236] However, in some cases an implied contract may arise when "'the government voluntarily undertakes an additional duty' beyond its normal obligation to the employee."[237] "An implied contract may arise from a variety of sources including personnel policies or provisions of an employment manual."[238] To qualify, a policy must include "a manifestation of the employer's intent that is communicated to the employee and sufficiently definite to operate as a contract provision."[239] The existence of implied contractual provisions is generally a question of fact.[240]

---

[233] *See Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007).
[234] Amended Compl. ¶¶ 208–10.
[235] Reply 25.
[236] *Canfield v. Layton City*, 2005 UT 60, ¶ 16, 122 P.3d 622, 626 (quoting *Buckner v. Kennard,* 2004 UT 78, ¶ 32, 99 P.3d 842).
[237] *Id.* (quoting *Piacitelli v. S. Utah State Coll.,* 636 P.2d 1063, 1066 (Utah 1981)).
[238] *Cabaness v. Thomas*, 2010 UT 23, ¶ 55, 232 P.3d 486, 502, abrogated on other grounds by *Gregory & Swapp, PLLC v. Kranendonk*, 2018 UT 36, ¶ 55, 424 P.3d 897.
[239] *Id.* (quoting *Johnson v. Morton Thiokol, Inc.,* 818 P.2d 997, 1002 (Utah 1991)).
[240] *Id.*

Multiple policies referenced in the Amended Complaint include language that could plausibly be construed as undertaking "additional duties beyond its normal obligations to its employees" by making definite promises on which USU employees "should reasonably be able to rely."[241] For example, Policy 311 states that "[u]nacceptable work performance . . . should be addressed through progressive performance management" before listing the exact progressive steps that should be taken.[242] This policy also says that "[a]n employee may resign, foregoing any rights to file a grievance, rather than face corrective action or disciplinary action."[243] Policy 321 states that if an employee reports abuse by another employee that the Office of Human Resources "will meet with the employee to discuss their concerns or observations" and will "initiate a review" of the situation to work toward an effective resolution.[244] And Policy 399 lists the reasons for which an employee may be dismissed.[245] These policies plausibly create obligations by which USU must abide and may therefore create implied contractual duties.

However, the Amended Complaint does not allege facts showing that Policy 305 could plausibly create an implied contract. When a manual, handbook, or policy includes "clear and conspicuous language disclaiming any contractual liability,"[246] it cannot create an implied-in-fact contract term.[247] Policy 305 contains such a clear disclaimer when it states, "[t]his Policy, along with all accompanying policies, procedures, and practices, is not intended to and does not create any contractual rights."[248] At this stage, the record does not indicate that this disclaimer in Policy

---

[241] *Id.*
[242] Policy 311 at 2–4, ECF No. 17–2, filed Sep. 26, 2025.
[243] *Id.* at 3.
[244] Policy 321 at 3, ECF No. 17–3, filed Sep. 26, 2025.
[245] Policy 399 at 3, ECF No. 17-7, filed Sep. 26, 2025.
[246] *Johnson v. Morton Thiokol, Inc*., 818 P.2d 997, 1003 (Utah 1991).
[247] *Branham v. Delta Airlines*, 184 F. Supp. 3d 1299, 1315 (D. Utah 2016), aff'd, 678 F. App'x 702 (10th Cir. 2017).
[248] Policy 305 at 2, ECF No. 17-1, filed Sep. 26, 2025.

305, an interim policy, would apply to the other policies the court has discussed. However, it certainly applies to prevent Policy 305 from forming an implied contractual provision.

### B.    Contractual Violations

Defendants argue that, even if the Amended Complaint plausibly alleges that some of the USU policies create implied contractual provisions, Plaintiff has still not alleged that those provisions were breached.[249] First, Ms. Crosbie claims that USU violated Policy 305 by terminating her in retaliation for filing a Title IX report.[250] However, as noted above, Policy 305 specifically states that it does not create any contractual rights.[251] Even if Policy 305 did create contractual rights, Ms. Crosbie does not allege any facts showing that she was retaliated against for her involvement in making a Title IX report.

Second, Ms. Crosbie alleges that USU violated Policy 311 by terminating her without any progressive discipline or opportunity to improve her performance.[252] The relevant policy provision states:

> Disciplinary action is typically imposed on a progressive basis moving from verbal to written to a final action, including termination. Progressive steps (see 2.3.1) may be skipped or repeated depending on the frequency, severity, or nature of the unacceptable work performance. In circumstances of serious misconduct, suspension without pay or immediate termination without notice may be appropriate.[253]

The Policy then outlines three progressive steps for discipline from verbal warning to a written warning to termination.[254]  Defendants argue that "[t]here was no implied contract that Plaintiff's

---

[249] Reply 25.
[250] Amended Compl. ¶ 208
[251] Policy 305 at 2.
[252] Amended Compl. ¶ 209.
[253] Policy 311 at 3.
[254] *Id.*

employment would not be terminated without notice and opportunity to improve her performance" because Policy 311 allows for immediate termination in cases of serious misconduct.[255] They contend that Ms. Crosbie was terminated for serious misconduct and so was not entitled to any progressive discipline.[256]

The Amended Complaint includes sufficient factual allegations to show that Policy 311 may have been violated. While it does allow for immediate termination in the case of serious misconduct, Ms. Crosbie has plausibly alleged that her misconduct was not serious. She states that she was fired for inadvertently withholding information that she openly disclosed as soon as it came up.[257] She also states that the review committee itself concluded that her termination was "unwarranted," her actions were neither intentional or malicious, and that she was merely caught up in "another party's action, and ineffective reporting systems."[258] Ms. Crosbie has plausibly pled that her conduct was not serious and that her immediate termination violated the progressive discipline provision of Policy 311.

Third, Ms. Crosbie claims that USU violated another provision of Policy 311 that states, "[a]n employee may resign, foregoing any rights to file a grievance, rather than face corrective action or disciplinary action."[259] She argues that Defendants effectively denied her the right to resign by hastily terminating her and failing to explain her rights.[260] However, under the plain language of this provision, Ms. Crosbie waived her right to resign when she filed her grievances.

---

[255] MTD 42.
[256] Reply 26.
[257] Amended Compl. ¶¶ 61, 84.
[258] *Id.* ¶¶ 117–19.
[259] Amended Compl. ¶ 209; Policy 305 at 4.
[260] Opp'n 26.

The Amended Complaint does not allege facts showing that USU breached this provision because Ms. Crosbie had no right to resign once she appealed her termination.

Fourth, Ms. Crosbie alleges that USU violated Policy 321 by retaliating against her for reporting Ms. Sabau's abuse and by failing to adequately investigate her allegations.[261] The relevant portion of this policy states that an employee who is subjected to abusive behavior should first discuss their concerns with their immediate supervisor.[262] Alternatively, the policy provides:

> If an employee does not feel comfortable contacting their immediate supervisor, the employee may contact another level of management within their reporting chain or the Office of Human Resources, who will meet with the employee to discuss their concerns or observations. The Office of Human Resources will then initiate a review and collaborate with the appropriate leadership and employee(s) to initiate an effective resolution.

Ms. Crosbie argues that she reported Ms. Sabau by talking to HR to corroborate Mr. Bovee's complaints but Ms. Sabau continued to mistreat her.[263]

Plaintiff does not explain how USU's alleged failure to investigate is related to her termination. As already discussed, the Amended Complaint does not allege facts sufficient to suggest that she was fired in retaliation for her report. There are no facts pled indicating that Ms. Sabau and Ms. Cantwell even knew that Ms. Crosbie met with HR. All the facts presented in the Amended Complaint show that Ms. Crosbie's termination, whether justified or not, was connected to her delay in reporting that she had seen the witness statement.

---

[261] Amended Compl. ¶ 210.
[262] Policy 321 at 3.
[263] Amended Compl. ¶¶ 72–74.

Furthermore, the Amended Complaint does not include facts showing that USU failed to comply with Policy 321. It alleges that Ms. Sabau continued to mistreat Ms. Crosbie, but Policy 321 only promised that HR would "initiate a review" based on Ms. Crosbie's report.[264] There are no facts on record showing what the HR department did or did not do after Ms. Crosbie's meeting. If anything, the Amended Complaint shows that HR was already in the process of reviewing Ms. Sabau's behavior, given that Ms. Sabau had been confronted by HR about prior complaints.[265]

Several of the USU policies that underly Ms. Crosbie's seventh cause of action could potentially be implied contractual provisions. However, the Amended Complaint only includes facts to plausibly allege that the progressive discipline provision of Policy 311 may have been violated, so Ms. Crosbie's breach of contract claim survives based on this alleged breach.

## IV.    Title IX Retaliation (Cause of Action VIII)

Finally, Plaintiff claims that she was discharged in retaliation for submitting a Title IX incident report.[266] "Title IX of the Education Amendments Act of 1972 . . . prohibits discrimination 'on the basis of sex' in educational programs or activities receiving federal funding."[267] It also "prohibits retaliation against individuals because they have complained of sex discrimination."[268] Title IX retaliation claims are analyzed under the same burden-shifting framework as Title VII claims.[269] Under this framework, the plaintiff bears the initial burden of

---

[264] *Id.*; *see also* Policy 321 at 3.
[265] Amended Compl. ¶ 73.
[266] Amended Compl. ¶¶ 219–20.
[267] *Hiatt v. Colorado Seminary*, 858 F.3d 1307, 1315 (10th Cir. 2017); 20 U.S.C. § 1681(a).
[268] *Hiatt*, 858 F.3d at 1315.
[269] *Pingree v. Univ. of Utah*, No. 2:20-CV-00724-JNP-CMR, 2025 WL 2379251, at *16 (D. Utah Aug. 15, 2025).

alleging facts to show that "(1) he [or she] engaged in protected opposition to discrimination, (2) he [or she] suffered an adverse action, and (3) a causal connection exists between the two."[270]

Defendants do not dispute that Ms. Crosbie engaged in protected activity by making a Title IX report or that her termination was an adverse employment action.[271] However, they argue that the Amended Complaint contains no facts showing a causal connection between the two.[272] Plaintiff responds that reaching this conclusion would require the court to "accept USU's factual version of her termination: that the reason it fired Ms. Crosbie was for not coming forward with a witness statement."[273] She contends that the Amended Complaint includes sufficient facts to justify an inference of retaliatory motive.[274]

The critical inquiry for the causal connection element is "whether the plaintiff has demonstrated that the employer's action occurred under circumstances which give rise to an inference of unlawful discrimination."[275] Factors to consider can include the employer's statements to or about the employee and the temporal proximity between the protected action and the adverse employment decision.[276] In this case, the Title IX report was submitted over a year before Ms. Crosbie was terminated, so the temporal proximity between the two creates no inference of retaliation.[277] Accordingly, the Amended Complaint must allege some other facts

---

[270] *Id.* (citing the Title VII standard in *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1252 (10th Cir. 2001)).
[271] MTD 47.
[272] *Id.*
[273] Opp'n 27.
[274] *Id.* at 28.
[275] *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 (10th Cir. 2006) (quoting *Garrett v. Hewlett–Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002) in the context of a FMLA retaliation claim).
[276] *See Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1092 (10th Cir. 2007).
[277] Amended Compl. ¶¶ 34–35, 77; *see Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (three months between protected activity and an adverse action is too long to establish causation).

that could give rise to the inference that Ms. Crosbie was fired *because* Mr. Olsen submitted a Title IX report on her behalf in April 2023.

The Amended Complaint states that "USU took adverse action against Ms. Crosbie in direct response to her protected [Title IX reporting] activity,"[278] but no facts are alleged to support this conclusory assertion. The termination letter referenced in the Amended Complaint states that Ms. Crosbie was terminated for her failure to comply with Policy 340 by not reporting relevant information about the witness statement.[279] Plaintiff herself alleges that "USU terminated Ms. Crosbie because she disclosed the existence of the witness statement when USU (through Husch Blackwell) finally interviewed her about the IR rather than when she was first shown the statement."[280] There are no facts in the Amended Complaint that could plausibly give rise to an inference that Ms. Crosbie was terminated for making a report rather than for belatedly disclosing the existence of the witness statement.

To the extent Ms. Crosbie argues that her retaliation claim is based on her participation in the investigation and attempts to connect it to her disclosure of the witness statement,[281] such a claim misinterprets the purpose of a Title IX retaliation claim. If an employee who has a duty to report Title IX violations is terminated for delaying their report or making a report that omits important information, it is technically true that the termination is "causally connected" to the report. But the purpose of allowing Title IX retaliation claims is to promote the reporting of discriminatory practices by providing protection against retaliation for coming forward against a

---

[278] Amended Compl. ¶ 218.
[279] *Id.* ¶¶ 81–83.
[280] *Id.* ¶ 84.
[281] *See* Opp'n 28.

co-worker, supervisor, or employer.[282] This purpose would be hindered if retaliation claims also protected employees from being disciplined for deficiencies in their required reports rather than for making the reports themselves.

Here, nothing in Ms. Crosbie's Amended Complaint permits an inference that she was terminated for making her Title IX report rather than for failing to report the existence of the witness statement when she first learned of it. Thus, she fails to state a claim for Title IX retaliation.

## ORDER

Defendant's [17] Motion to Dismiss is GRANTED in part and DENIED in part. Plaintiff's First, Second, Third, Fourth, Sixth, and Eighth causes of action are dismissed as to all defendants. Plaintiff's Fifth cause of action is dismissed as to all defendants except Ms. Cantwell and Ms. Sabau in their individual capacities.

Signed January 28, 2026.

BY THE COURT

_____
David Barlow
United States District Judge

---

[282] *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 169 (2005).